

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-07-00069-CR
_____

ELBERT LEE DOOLITTLE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th Judicial District Court
Red River County, Texas
Trial Court No. CR00827

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

On September 13, 2005, Red River Sheriff's Deputy Karen (Smith) Garrett set up a drug buy from Elbert Lee Doolittle using confidential informant DeShon McCulloch as her proxy.[1] To make the purchase, McCulloch rode with Garrett to Doolittle's house in Clarksville, Texas. McCulloch went to the door and spoke with Doolittle on the porch. When Doolittle indicated that he did not have the drugs at the time but would need a few minutes to get them, McCulloch and Garrett drove around and returned to the house about twenty minutes later. Once Doolittle returned, Garrett said she parked her car in the driveway behind Doolittle's vehicle. McCulloch got out of Garrett's car, walked to the driver's side of Doolittle's, and leaned in. Garrett testified she saw Doolittle hand something to McCulloch. The arranged purchase had been for somewhere between seven and ten grams of methamphetamine, but Doolittle provided only about three grams at the time.[2]

To make up for the deficit in methamphetamine, Doolittle met with Garrett and McCulloch the next day at the Red River Inn and gave them a quantity of crack cocaine; but evidence of that day-after transaction was kept from the jury when the trial court found McCulloch's written statement to police had been improperly executed. Also, in a transaction occurring September 9,

---

[1]Garrett set up and worked several drug buys during this period and was assisted by McCulloch in a few of those.

[2]Subsequent laboratory analysis, in fact, showed the methamphetamine delivered that evening weighed only 1.89 grams.

another alleged drug delivery occurred involving Doolittle; evidence of that transaction is also at issue in this appeal.

Because (1) admitting evidence of the September 9 transaction was not error, (2) admitting evidence of the September 14 transaction was not error, (3) Doolittle's multifarious due-process point of error presents no reversible error, and (4) denying Doolittle a new trial in spite of a recanting witness was not error, we affirm the judgment of the trial court.

*(1)*      *Admitting Evidence of the September 9 Transaction Was Not Error*

Doolittle complains the trial court erred by admitting evidence of an extraneous offense, a September 9 drug transaction between Doolittle and McCulloch.[3]

We review a trial court's ruling admitting or excluding evidence for abuse of discretion and uphold it "if it is reasonably supported by the record and is correct under any theory of law applicable to the case." *Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

---

[3]In the same point of error, he complains about admission of evidence of a September 14 transaction. This point of error is arguably multifarious, as Doolittle presents two complaints within a single point of error. A point of error that embraces more than one specific ground of error is multifarious. *See Bell v. Tex. Dep't of Criminal Justice—Institutional Div.*, 962 S.W.2d 156, 157–58 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). If a point of error is multifarious, we could refuse to review it. *See id.* at 158. We may consider multifarious points of error, however, if we can determine with reasonable certainty the alleged error about which complaint is made. *See id.* Because we are able to determine the errors about which Doolittle complains, we will, in the interest of justice, consider his complaints. *See id.* We address the September 14 evidence in a separate section of this opinion.

The first mention of the September 9 incident occurred when Doolittle's counsel was cross-examining Garrett:

> Q. [By Defense Counsel]: And you knew Mr. Doolittle, didn't you? He knew you, didn't he?
>
> A. [By Garrett]: I didn't know Mr. Doolittle. I'm not from here.
>
> Q. Ma'am, you knew Mr. Doolittle -- this was September 13th you said, right?
>
> A. Yes.
>
> Q. You saw Mr . Doolittle two or three days before that didn't you?
>
> A. I possibly did.

On re-direct, the State asked Garrett where she had seen Doolittle shortly before the September 13 transaction. She answered, "I believe that was another case that we have on Mr. Doolittle." The questioning continued as follows:

> Q. [By the State]: In fact, it happened about September 9th, 2005, is that right?
>
> A. [ By Garrett]: I believe it is, yes.
>
> Q. And where did you see him on that day?
>
> A. I'm not sure where exactly, the exact location was because we had several cases on several people and I'm not sure exactly where that one took place at.
>
> Q. Are you familiar with the Kwiki?
>
> A. Yes.

4

Q. Did you see Mr. Doolittle at the Kwiki?

A. Yes, I did.

Q. And did you have a tape of that transaction?

A. Yes.

Q. That's a good tape, right?

A. Yes, it is.

[Defense Counsel]: Objection, Your Honor. That goes -- I object to that being -- leading the witness, "it's a good tape."

THE COURT: Overruled.

[Defense Counsel]: It's not relevant to this case, Your Honor, and I object to that.

THE COURT: Overruled.

Later, after the above re-direct, on re-cross Doolittle tried to question whether Garrett saw the September 13 drug transaction. Doolittle then begins the following line of questioning:

Q. [By Defense Counsel]: . . . On 9-9-05 [sic], you had occasion to be with McCulloch and Doolittle at the Kwiki Superette, did you not?

A. [By Garrett]: Yes.

Q. And you knew him [Doolittle] at that time, right?

A. I mean --

Q. You were undercover with Mr. McCulloch at that time, were you not?

5

A. Yes.

Q. And he knew you? He knew you a cop [sic], did he not?

A. Not to my knowledge. I mean I don't know how he would have known that I was a police officer.

Q. You have been here since July?

A. Yes, but I had not been in uniform.

Q. The video, you had supposedly a video on the Kwiki. That's no better than this video?[4]

A. The one from the Kwiki?

Q. The one from the Kwiki does not show one thing, does it, just like this one, is that right?

A. That video does, yes.

Q. I would like to see it. The video that I have got doesn't show anything.

[State]: I would be glad to go get it right now.

[Defense counsel]: Go ahead. We'll go look at it.

THE COURT: We are not going to look at it right now so don't go get it right now. We will discuss this out of the presence of the jury in a few minutes.

---

[4]Garrett had previously testified that, while she tried to videotape the September 13 transaction, the equipment failed to record events she witnessed.

Later, when the State offered the videotape of the September 9 transaction, Doolittle acquiesced to its admission.[5] On the videotape of the September 9 transaction, McCulloch can be seen walking to the window of Doolittle's car and stopping for barely a second. From our review, it is impossible to tell if McCulloch handed something to Doolittle, received something, or both. Later, when McCulloch took the stand, Doolittle presented a defensive theory that McCulloch owed Doolittle rent money; that he gave some of the money for rent on September 13, and some in the September 9 videotape.

As a general proposition, when a party introduces matters into evidence, that invites the other side to reply to that evidence. *Wheeler v. State*, 67 S.W.3d 879, 885 n.13 (Tex. Crim. App. 2002); *Kincaid v. State*, 534 S.W.2d 340, 342 (Tex. Crim. App. 1976). Evidence that is otherwise inadmissible may be admitted to correct a false impression left by the questioning of a witness. *See Jensen v. State*, 66 S.W.3d 528, 538 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). Thus, inadmissible evidence may be admitted if the party against whom the evidence is offered opens the door, provided the evidence does not stray beyond the scope of the invitation. *Feldman v. State*, 71 S.W.3d 738, 755–56 (Tex. Crim. App. 2002); *Schutz v. State*, 957 S.W.2d 52, 71 (Tex. Crim. App. 1997); *cf. West v. State*, 169 S.W.3d 275, 279–80 (Tex. App.—Fort Worth 2005, pet.

---

[5]Doolittle objected, apparently only to the whole, roughly hour-long videotape being admitted; when it was proposed that only a brief minute or so, showing the "hand off" would be offered, he stated, "That's all fine with me judge. I just wanted to make sure there is nothing else there if the jury reviews the tape."

ref'd) (defendant's testimony that he was "shocked" at his arrest did not open door to evidence he had been arrested more than twenty times before; error harmless).

Doolittle introduced the topic of the events of September 9 in his questioning of Garrett, trying to establish some level of acquaintance between Garrett and Doolittle. Once Doolittle first brought to the jury's attention evidence concerning a September 9 encounter between Garrett and Doolittle and questioned how well Garrett and Doolittle therefore knew each other September 13, he cannot later complain of the admission of other evidence, which properly explains the context of the September 9 transaction and how that might have affected the degree to which Garrett and Doolittle knew each other September 13. The "door was opened." We overrule this point of error.

*(2)     Admitting Evidence of the September 14 Transaction Was Not Error*

Doolittle also asserts that evidence of a transaction occurring September 14, the day following the charged offense date, was improperly admitted. The admissibility of the September 14 dealings was an issue of apparently less importance to the parties than was the issue of the admissibility of the September 9 transaction, which was clearly a transaction extraneous to the offense of September 13. On the other hand, because the September 14 transaction involved Doolittle's delivery of additional drugs to make up a shortage in the quantity of methamphetamine delivered September 13, the September 14 transaction appears to be same-transaction contextual evidence that explains and shows the completion of the September 13 offense.

> Extraneous offenses may be admissible as same transaction contextual evidence
> when "several crimes are intermixed, or blended with one another, or connected so

8

that they form an indivisible criminal transaction." *Prible v. State*, 175 S.W.3d 724, 731–32 (Tex. Crim. App 2005), *cert. denied*, 546 U.S. 962 (2005) (quoting *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). This type of evidence results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case difficult to understand or incomplete. *Prible*, 175 S.W.3d 732. Under such circumstances, "the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986).

*Maranda v. State*, No. 07-05-0413-CR, 2007 Tex. App. LEXIS 9285, at *8–9 (Tex. App.—Amarillo Nov. 28, 2007, pet. dism'd). Thus, although the parties do not argue this point, we would overrule the challenge to the admission of evidence of the September 14 transaction on the basis that it is same-transaction contextual evidence because such admission of evidence was "correct under any theory of law applicable to the case." *See Ramos*, 245 S.W.3d at 417–18; *Dixon*, 206 S.W.3d at 590.

Another factor dictating overruling Doolittle's challenge to the admission of the September 14 evidence is that no error was preserved as to that evidence. When the State posed questions about September 14, Doolittle objected under Rule 404(b), but not under Rule 403. *See* TEX. R. EVID. 403, 404(b).

If the trial court overrules an objection to the admissibility of the evidence under Rule 404(b), the objecting party must also make a Rule 403 objection, explaining that the prejudicial potential substantially outweighs the probative value of the evidence, in order to preserve error. TEX. R. EVID. 403; *Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1990) (op. on reh'g);

9

*McAllister v. State*, 34 S.W.3d 346, 353–54 (Tex. App.—Texarkana 2000, pet. ref'd); *Powell v. State*, 5 S.W.3d 369, 383 (Tex. App.—Texarkana 1999, pet. ref'd).

Admission of evidence of the September 14 transaction was not error.

*(3)     Doolittle's Multifarious Due-Process Point of Error Presents No Reversible Error*

The second point of error complains that the way the trial court conducted the trial amounted to a denial of Doolittle's due-process rights. Doolittle claims fundamental error occurred in two different actions of the trial court, allowing the State to voir dire or "woodshed" confidential informant McCulloch out of the jury's presence, in the middle of McCulloch's testimony, and an expletive Doolittle claims the trial court directed to the defense counsel, an expletive Doolittle claims is not reported in the record.[6]

What constitutes "fundamental error" is hard to define. In general, it can be said that such errors are those which affect a defendant's substantial rights. *Cf. Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (trial court's statement to venire that defendant considered pleading guilty and trial court preferred defendant to plead guilty undermined defendant's presumption of innocence and was fundamental error).

We do not find that any of Doolittle's substantial rights were negatively affected by either of the trial court's two alleged acts.

---

[6]This point of error is also arguably multifarious, as Doolittle presents two complaints within a single point of error. As with the extraneous evidence point of error, because we are able to determine the errors about which Doolittle complains, we will, in the interest of justice, consider his complaints.

10

(*a*)     State's "Woodshedding" Session

Part of Doolittle's complaint is that the State was improperly allowed to "woodshed" or coach witness McCulloch.  But, while there was extensive voir dire of the witness to refresh his memory about an alleged September 14 drug transaction, the trial court concluded at the end of that voir dire that the State would not be allowed to use the "refreshed" testimony concerning the September 14 transaction.  Therefore, no harm befell Doolittle.

After the jury was sent out, the bulk of the questioning of McCulloch, conducted by the State and the trial court, concerned McCulloch's memory of an alleged drug transaction on September 14. The vacillating testimony elicited from McCulloch was that, on September 13, the date of the charged offense, Doolittle had not delivered the promised amount of methamphetamine to McCulloch: instead of ten grams, he delivered less than three.  In a written statement, and in some of his voir dire testimony, McCulloch said that, on September 14, Doolittle came to the Red River Inn and gave McCulloch six rocks of crack cocaine, to make up for the previous day's deficiency. Ultimately, the trial court found McCulloch's written statement to have been obtained improperly, and refused to allow the State to reference the September 14 delivery in any subsequent McCulloch testimony.  The jury was not allowed to hear anything further from McCulloch about September 14, to contradict what he had already testified to, that no drugs were delivered in that transaction.  In other words, any benefit or advantage the State may have obtained by its voir dire of McCulloch was

11

lost because the State was not permitted to present any evidence from McCulloch's refreshed memory.

Doolittle has failed to show any harm from the "woodshedding" session.

*b)*     *Trial Court's Comments to Defense Counsel*

Doolittle also asserts fundamental error is found in certain alleged statements by the trial court directed at Doolittle's counsel, ostensibly denying Doolittle a fair trial.  As the trial court wrapped up the above voir dire session with McCulloch, the trial court asked if Doolittle objected to a videotape of the September 9 transaction being admitted to evidence:  "Do you object to [the video of the Kwiki incident] being used?"  Doolittle's attorney said, "Well, I mean you have allowed that into evidence as far as that other extraneous offense."  The trial court pointed out that testimony of the extraneous offense had been admitted, but not the videotape.  Then Doolittle's attorney says, "Well, to me the videotape helps me."

The jury was returned to the courtroom, and the State moved to offer the videotape of the September 9 transaction.  Previously, the State said it would condense the videotape and only offer about thirty seconds, which showed the purported delivery.  But, when offering the videotape, the State said,

> [A] lot of it is going to his house and setting up the deal and there is a lot of wasted time.  We have condensed it down to about 30 seconds at the Kwiki after the deal has been made regarding the money and stuff and what the transaction would be, and then him having to go in and get change at the Kwiki.

12

On hearing this explanation, Doolittle's counsel objected: "I object to it being offered in total as an exhibit. I haven't reviewed whatever has been consolidated or eliminated." The trial court sent the jury out, and Doolittle's counsel started to say something to the trial court. The court stopped him by saying, "Don't get me started. I'm getting pissed off. Run the damn tape." In a motion to supplement the court reporter's record, Doolittle claimed the trial court's language was stronger, and occurred in the presence of the jury.

We abated this disputed matter to the trial court for a resolution of the question about the reporter's record. A specially appointed district judge held a hearing at which the original trial judge, the court reporter, and one juror testified. As a result of the hearing, the specially assigned judge expressly found the original record to be "substantially correct and [not in need of] reform[ation]." According to the special judge, the trial court was "upset as to Defense Counsel's conduct before the jury," but there was "no credible evidence that any juror heard or that Appellant's interest was adversely influenced by the Trial Court's language or demeanor toward defense counsel at the disputed point in the record."

The record before us states the jury was out of the courtroom when the trial judge stated he was getting angry; and an independent trial court heard testimony from a juror. Because we find nothing in the record to suggest any error or harm in this regard, we overrule this point of error.

13

*(4)      Denying Doolittle a New Trial in Spite of a Recanting Witness Was Not Error*

Doolittle's final point of error claims the trial court should have granted Doolittle's motion for a new trial. The new trial motion and hearing were focused on McCulloch's affidavit, about a week after trial, which stated that he had lied at trial, that he had not bought drugs from Doolittle September 13, and that it was too dark for Garrett to have seen the transaction. A week after signing that affidavit, McCulloch signed another statement at the county attorney's office, saying he signed the first affidavit because he was scared that Doolittle's sons were going to harm McCulloch or his family, and that his trial testimony had been accurate: he had purchased methamphetamine from Doolittle on September 13, 2005, and it was light enough at the time for Garrett to have seen the transaction.

Where a recantation of testimony has been made by a principal witness, the trial court hearing the motion is entitled to disbelieve that later statement and accept the earlier testimony as true. *Williams v. State*, 375 S.W.2d 449, 451–52 (Tex. Crim. App. 1964); *Banda v. State*, 727 S.W.2d 679, 682 (Tex. App.—Austin 1987, no pet.). The trial court is well positioned to see the witness, observe his or her demeanor, and determine his or her credibility. *Ashcraft v. State*, 918 S.W.2d 648, 653 (Tex. App.—Waco 1996, pet. ref'd). An order denying a motion for new trial may be reversed on appeal only when there is a clear abuse of the trial court's discretion. *Banda*, 727 S.W.2d at 682.

At the hearing on Doolittle's motion for new trial, the legal assistant to Doolittle's attorney testified that McCulloch came to the attorney's office, a few days after the trial, and asked her to

14

prepare the affidavit. The assistant contradicted the subsequent written statement made by McCulloch for the State. Instead, she said he did not leave the office and then return, and she did not tell McCulloch that Doolittle's attorney wanted him to look over the prepared affidavit because "Red River County was not right." She said that McCulloch brought Doolittle's wife to the attorney's office, while in McCulloch's statement for the State, he said the wife was already there when he arrived. Doolittle's wife testified that, after the trial, McCulloch called her asking how to get in touch with Doolittle's attorney.

The trial court's findings of fact and conclusions of law state that McCulloch was an "incredible witness" and specifically cites testimony and evidence that, when McCulloch was searched before the drug-purchase transaction, he had no contraband, but that, after the deal with Doolittle, he possessed methamphetamine. When the trial court ruled on the motion for new trial, it stated, "McCulloch is a liar. . . . He has changed his testimony a number of times. What has not changed is the testimony of the officer who said she saw the transaction, that the man brought substances back and delivered them to her in her car. . . . Her testimony has not been challenged."

As no clear abuse of discretion has been shown in the trial court's ruling, we overrule this point of error.

15

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted:    April 23, 2008
Date Decided:     June 5, 2008

Do Not Publish